PAULINE C. HANSEL, EMPLOYEE-PLAINTIFF v. SHERMAN TEXTILES, EMPLOYER, TRAVELERS INSURANCE COMPANY, CARRIER-DEFENDANTS

No. 107

(Filed 6 October 1981)

1. **Master and Servant § 96— workers' compensation—conclusiveness of findings supported by evidence**

   The findings of fact made by the Industrial Commission in a workers' compensation proceeding are conclusive on appeal if supported by competent evidence even though there is evidence which would support findings to the contrary.

2. **Master and Servant § 68— workers' compensation—occupational disease**

   In order for any disease, other than those specifically named in G.S. 97-53, to be deemed an "occupational disease," it must be "proven to be due to" causes and conditions as specified in that statute.

3. **Master and Servant § 68— workers' compensation—occupational disease**

   The three elements necessary to prove the existence of a compensable "occupational disease" are: (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be

Hansel v. Sherman Textiles

proof of causation, *i.e.*, proof of a causal connection between the disease and the employment.

4. **Master and Servant § 68— workers' compensation—non-occupational diseases of respiratory system—aggravation from conditions of employment**

In cases in which a claimant for workers' compensation has non-occupational infirmities related solely to the lungs or respiratory system, the Industrial Commission should, as a matter of course, consider whether claimant's disablement (*i.e.* inability to work and earn wages) results from aggravation of those non-occupational diseases or infirmities by causes and conditions peculiar to claimant's employment.

5. **Master and Servant § 68— workers' compensation—non-occupational disease—aggravation by conditions of employment**

If there is no aggravation or acceleration, a disease or condition which is non-occupational in its incipience is non-compensable as a matter of law notwithstanding the intervention of years of occupational exposure to hazardous conditions between the time the disease was contracted and the time it became disabling; if, however, a disease or condition which is non-occupational in its incipience is in fact aggravated or accelerated by causes and conditions peculiar to the claimant's employment, disability resulting therefrom is compensable.

6. **Master and Servant § 68— workers' compensation—occupational disease—necessary findings**

Where the Industrial Commission awards compensation for disablement due to an occupational disease encompassed by G.S. 97-53(13), the opinion and award must contain findings as to the characteristics, symptoms and manifestations of the disease from which the plaintiff suffers as well as a conclusion of law as to whether the disease falls within the statutory provision; however, such findings are not necessary when the Commission finds that the disease, whatever its manifestations and symptoms, was not due to causes or conditions characteristic of the particular employment in which the employee was engaged.

7. **Master and Servant § 68— workers' compensation—byssinosis as partial cause of disability**

Where the Industrial Commission found that plaintiff's byssinosis was "partly responsible for her disability" and the evidence indicated that plaintiff suffered from other diseases or infirmities, including asthma, chronic bronchitis, emphysema, and certain allergies, the Commission should have determined what percentage of plaintiff's disability was due to her occupational disease.

8. **Master and Servant § 68— workers' compensation—occupational disease—cause of disability—remand for further evidence and findings**

Where, in a proceeding brought by plaintiff to recover workers' compensation for disability allegedly resulting from the occupational disease byssinosis, the medical evidence in the record was not sufficiently definite as to the cause of plaintiff's disability to permit effective appellate review, the case must be

remanded for further medical testimony and findings as to the following questions: (1) whether plaintiff is totally or partially incapacitated to work and earn wages, and if partially incapacitated, the percentage of her disability; (2) what disease or diseases caused this disability; (3) which of the plaintiff's disabling diseases are occupational in origin; (4) whether plaintiff suffers from disabling diseases or infirmities which are not occupational in origin; (5) whether plaintiff's non-occupational diseases or infirmities aggravated or accelerated her occupational disease; (6) the percentage of plaintiff's incapacity to work and earn wages which results from (a) her occupational disease or (b) her non-occupational diseases which were aggravated or accelerated by her occupational disease; and (7) the percentage of plaintiff's incapacity to work and earn wages which results from non-occupational diseases or infirmities.

Justice EXUM concurring in result.

Justice CARLTON joins in this concurring opinion.

ON appeal by defendant as of right pursuant to G.S. 7A-30(2), 49 N.C. App. 1, 270 S.E. 2d 585 (1980) (opinion by *Erwin, J.* with *Hedrick, J.* concurring and *Wells, J.* dissenting). The Court of Appeals vacated an opinion and award of the North Carolina Industrial Commission in plaintiff's favor filed 17 December 1979. This case was docketed and argued as No. 2, Spring Term 1981.

This proceeding was begun before the Industrial Commission as a compensation claim by plaintiff, a woman fifty-one years of age, seeking recovery on the grounds that she contracted byssinosis as a result of exposure to cotton dust in the course of her employment as a textile worker in defendant's plant. The matter was first heard before Deputy Commissioner Lawrence B. Shuping, Jr., in Shelby on 10 April 1979 at which time, by agreement of the parties, the hearing was limited to the taking of testimony of Dr. T. Reginald Harris. After taking Dr. Harris's testimony, the matter was reset for hearing in Gastonia. The matter subsequently came on for hearing before Deputy Commissioner Christine Y. Denson on 16 July 1979. The parties stipulated in pertinent part that the plaintiff last worked for defendant on 5 May 1977 at which time the employee-employer relationship existed between plaintiff and defendant; that the parties were subject to the provisions of the Workers' Compensation Act; and that plaintiff's average weekly wage was $140.90. The following FINDINGS OF FACT, CONCLUSION OF LAW, and AWARD were entered by Deputy Commissioner Denson:

### FINDINGS OF FACT

1. Plaintiff was born on January 8, 1928. At the age of 16 she began working in a textile mill and has worked in a textile mill up to May 5, 1977, except for six months in a paper mill.

2. Most recently, plaintiff worked from 1955 to 1965 in the Gamble Melville mill in Bessemer City. She worked in weaving, but her station was next to the door to the card room which was opened frequently. Cotton dust was visible in the air.

In 1966 plaintiff worked in the Osage mill in Bessemer City as a weaver. Very little cotton was processed but the air was very dusty none-the-less.

In 1967 plaintiff began working for defendant-employer as a weaver. Except for a six month's absence in 1971, plaintiff worked continuously until May 5, 1977. The air was very dusty from the cotton that was processed.

Plaintiff in about 1972, began to notice that when she began the work week on Sunday night, she would have chest tightness and some coughing after being there two or three hours. In about 1974 or 1975, plaintiff felt that way all the time at work with no particular time being worse.

3. Because of shortness of breath and other respiratory problems and some blackout spells, plaintiff moved to the cloth room during the last six months of her employment by defendant. This took her out of dust but her respiratory problems had reached the irreversible stage, and she could hardly exert herself. She quit on May 5, 1977 because of respiratory problems.

4. Plaintiff has both asthma and byssinosis which are causing her respiratory impairment. Her impairment is severe and irreversible.

5. Plaintiff has byssinosis as a result of her exposure to cotton dust in her employment with defendant-employer and this is partly responsible for her disability.

6. Plaintiff has not worked since May 5, 1977.

Hansel v. Sherman Textiles

* * *

The foregoing findings of fact and conclusions of law engender the following additional

CONCLUSION OF LAW

1. Plaintiff has contracted the disease byssinosis as a result of exposure to cotton dust in her employment with defendant-employer. This disease is compensable under the provisions of G.S. 97-53(13).

2. Defendants owe plaintiff compensation for permanent, partial disability from May 5, 1977 for her period of disability not to exceed 300 weeks. G.S. 97-30.

* * *

Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following

AWARD

1. Subject to counsel fee, defendants shall pay plaintiff compensation in the amount of $99.94 per week from May 5, 1977 for the period of plaintiff's disability but for a period not to exceed 300 weeks.

2. An attorney fee in the sum of $5,000.00 is awarded plaintiff's counsel and shall be deducted from accured compensation.

3. Defendants shall pay all medical expenses incurred as a result of the occupational disease giving rise hereto.

4. Defendants shall pay the costs.

This the 30th day of July, 1979.

Upon entry of the foregoing opinion and award, the defendants appealed to the full Commission. On 17 December 1979 the full Commission, with Commissioner Robert S. Brown dissenting, entered its opinion and award adopting as its own the decision by Deputy Commissioner Denson in its entirety and affirming her award in all respects. Defendants appealed to the North Carolina Court of Appeals pursuant to G.S. 97-88. The case was heard by the Court of Appeals on 28 August 1980 and that court on 7 October 1980 filed its opinion vacating the award of the full Commission upon its conclusion that the Commission's finding that the

plaintiff contracted byssinosis as a result of her exposure to cotton dust in her employment with defendant was unsupported by sufficient competent evidence. Wells, J. dissented. Plaintiff appealed as of right pursuant to G.S. 7A-30(2).

*Frederick R. Stann for plaintiff-appellant.*

*Hollowell, Stott, Hollowell, Palmer & Windham, by James C. Windham for defendant-appellee.*

MEYER, Justice.

Pursuant to Rule 16 of the Rules of Appellate Procedure, review by the Supreme Court after a determination by the Court of Appeals, is to determine whether there is error of law in the decision of the Court of Appeals.

Even though the record in the case before us may support a finding that plaintiff did not contract an occupational disease as a result of exposure to cotton dust in her employment with the defendant, if, upon review, this Court finds that the decision of the full commission in its opinion and award is supported by competent evidence, we must conclude that there is error as a matter of law in the decision of the Court of Appeals.

[1] Under the provisions of G.S. 97-86, the Industrial Commission is the fact finding body and the rule under the uniform decisions of this Court is that the findings of fact made by the Commission are conclusive on appeal, both before the Court of Appeals and in this Court, if supported by competent evidence. This is so even though there is evidence which would support a finding to the contrary. *Inscoe v. Industries, Inc.*, 292 N.C. 210, 232 S.E. 2d 449 (1977); *Cole v. Guilford County*, 259 N.C. 724, 131 S.E. 2d 308 (1963); *Vause v. Equipment Co.*, 233 N.C. 88, 63 S.E. 2d 173 (1951); 8 Strong's N.C. Index 3d, Master and Servant § 96, and cases there cited.

> In passing upon an appeal from an award of the Industrial Commission, the reviewing court is limited in its inquiry to two questions of law, namely: (1) whether or not there was any competent evidence before the Commission to support its findings of fact; and (2) whether or not the findings of fact of the Commission justify its legal conclusions and decision.

*Inscoe v. Industries, Inc.*, 292 N.C. 210, 216, 232 S.E. 2d 449, 452 (1977); *Henry v. Leather Co.*, 231 N.C. 477, 57 S.E. 2d 760 (1950).

As demonstrated by the majority of the Court of Appeals, there was evidence before the Commission in this case which would have supported a finding that the plaintiff did not contract byssinosis as a result of her exposure to cotton dust in her employment with defendant. It is apparent upon review of the evidence in the record before us that there is substantial and convincing evidence that the plaintiff's symptoms could just as likely have been the result of her asthma and chronic bronchitis conditions as of byssinosis resulting from prolonged exposure to cotton dust. However, that is not the test. The test, as indicated above, is whether there is, in the record that was before the Court of Appeals and which is now before us, competent evidence which would support the Commission's finding that plaintiff contracted byssinosis as a result of her exposure to cotton dust in her employment with the defendant-employer.

It is not the role of the Court of Appeals or of this Court to substitute its judgment for that of the finder of fact.

When the aggrieved party appeals to an appellate court from a decision of the Full Commission on the theory that the underlying findings of fact of the Full Commission are not supported by competent evidence, the appellate courts do not retry the facts. *Moses v. Bartholomew*, 238 N.C. 714, 78 S.E. 2d 923 (1953). It is the duty of the appellate court to determine whether, in any reasonable view of the evidence before the Commission, it is sufficient to support the critical findings necessary for a compensation award. *Keller v. Electric Wiring Co.*, 259 N.C. 222, 130 S.E. 2d 342 (1963).

*Inscoe v. Industries, Inc.*, 292 N.C. 210, 217, 232 S.E. 2d 449, 453 (1977).

In his dissent, Judge Wells examined the record and found substantial competent evidence to support the full Commission's findings and conclusions. We likewise find competent evidence to support the findings of the Commission, but we are unable to say that the findings justify the Commission's conclusion as to causation and its award. While the two-judge majority of the panel at the Court of Appeals failed to find sufficient evidence in the

record before the Commission to support the opinion and award, and the dissenting judge reviewing the same record found ample evidence to support it, our comprehensive review of that same record leads us to an entirely different conclusion. We conclude that the medical evidence in the record is not sufficiently definite as to the cause of plaintiff's disability to permit effective appellate review.

For a disability to be compensable under our Workers' Compensation Act, it must be either the result of an accident arising out of and in the course of employment or an "occupational disease."

G.S. 97-52 provides in effect that disablement of an employee resulting from an "occupational disease" described in G.S. 97-53 shall be treated as the happening of an injury by accident. This section provides specifically:

> The word 'accident' . . . shall not be construed to mean a series of events in employment of a similar or like nature occurring regularly, continuously . . . whether such events may or may not be attributable to the fault of the employer and *disease attributable to such causes shall be compensable only if culminating in an occupational disease mentioned in and compensable under this article.* (Emphasis added.)

G.S. 97-53 contains the comprehensive list of occupational diseases for which compensation is provided in the Act.

By the express language of G.S. 97-53, only the diseases and conditions enumerated therein shall be deemed to be occupational diseases within the meaning of the Act.

Byssinosis is not "mentioned in and compensable under" the Act, except by virtue of G.S. 97-53, which provides in pertinent part as follows:

> Section 97-53. Occupational diseases enumerated; . . . the following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this Article:
>
>                         .   .   .
>
> (13) Any disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all or-

dinary diseases of life to which the general public is equally exposed outside of the employment.

**[2, 3]** In *Booker v. Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979), Chief Justice Sharp exhaustively examined the true meaning of the term "occupational disease" as that term is used in our Workers' Compensation Act. It is unnecessary for us to repeat the results of that examination here. The clear language of G.S. 97-53 is that for any disease, other than those specifically named, to be deemed an "occupational disease" within the meaning of the Article, it must be "proven to be due to," causes and conditions as specified in that statute. This Court held in *Booker* that there are three elements necessary to prove the existence of a compensable "occupational disease": (1) the disease must be characteristic of a trade or occupation, (2) the disease is not an ordinary disease of life to which the public is equally exposed outside of the employment, and (3) there must be proof of causation, *i.e.*, proof of a causal connection between the disease and the employment. *Id.* at 468, 475, 256 S.E. 2d at 196, 200.

With regard to the third element, this Court further said in *Booker*:

> It is this limitation which protects our Workmen's Compensation Act from being converted into a general health and insurance benefit act. *Bryan v. Church*, 267 N.C. 111, 115, 147 S.E. 2d 633, 635 (1966). In *Duncan v. Charlotte*, 234 N.C. 86, 91, 66 S.E. 2d 22, 25 (1951) we held that the addition of G.S. 97-53 to the Act 'in nowise relaxed the fundamental principle which requires proof of causal relation between injury and employment. And nonetheless [sic], since the adoption of the amendment, may an award for an occupational disease be sanctioned unless it be shown that the disease was incident to or the result of the particular employment in which the workman was engaged.'

297 N.C. at 475, 256 S.E. 2d at 200.

In workers' compensation actions the rule of causation is that where the right to recover is based on injury by accident, the employment need not be the sole causative force to render an injury compensable.

[If the employee] by reason of constitutional infirmaties is predisposed to sustain injuries while engaged in labor, nevertheless the leniency and humanity of the law permit him to recover compensation if the physical aspects of the employment contribute in some reasonable degree to bring about or intensify the condition which renders him susceptible to such accident and consequent injury.

*Vause v. Equipment Co.*, 233 N.C. 88, 92, 63 S.E. 2d 173, 176 (1951).

It has on occasion been implied that a similar rule of causation should prevail in cases where compensation for occupational disease is sought; however, if a disease is produced by some extrinsic or independent agency, it may not be imputed to the occupation or the employment. *Duncan v. Charlotte*, 234 N.C. 86, 66 S.E. 2d 22 (1951); *Moore v. Stevens & Co.*, 47 N.C. App. 744, 748, 269 S.E. 2d 159, 162 (1980).

[4] It is axiomatic that neither Mrs. Hansel's asthma nor her chronic bronchitis is an "occupational disease" which standing alone is compensable under the Workers' Compensation Act, nor does either party make such a contention. The questions of *aggravation* or acceleration of these diseases or infirmities was not considered by Deputy Commissioner Denson or the full Commission, nor was it addressed in the evidence. We believe that it should have been. In cases in which a claimant has other infirmities related solely to the lungs or respiratory system, the Commission should, as a matter of course, consider whether claimant's disablement (*i.e.* inability to work and earn wages) results from aggravation of those other non-occupational diseases or infirmities by causes and conditions peculiar to claimant's employment.

[5] If there is no aggravation or acceleration, a disease or condition which is non-occupational in its incipience, is non-compensable as a matter of law notwithstanding the intervention of years of occupational exposure to hazardous conditions between the time the disease was contracted and the time it became disabling. If however a disease or condition which is non-occupational in its incipience is in fact aggravated or accelerated by causes and conditions peculiar to the claimant's employment, disability resulting therefrom is compensable.

[6] As indicated in *Booker*, a claimant's right to compensation for an occupational disease under G.S. 97-53(13) and G.S. 97-52 depends upon proper proof of causation, and the burden of proving each and every element of compensability is upon the plaintiff. *Richards v. Nationwide Homes*, 263 N.C. 295, 139 S.E. 2d 645 (1965); *Aylor v. Barnes*, 242 N.C. 223, 87 S.E. 2d 269 (1955). It is true that, where the Commission awards compensation for disablement due to an occupational disease encompassed by G.S. 97-53(13), the opinion and award must contain findings as to the characteristics, symptoms and manifestations of the disease from which the plaintiff suffers, as well as a conclusion of law as to whether the disease falls within the statutory provision. *Wood v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979). However, such findings should not be necessary upon the Commission's finding that the disease, whatever its manifestations and whatever its symptoms, was not due to causes or conditions characteristic of the particular employment in which the employee was engaged. The denial of compensation may be predicated upon the failure of the claimant to prove any one of the elements of compensability. *See, Moore v. Stevens & Co.*, 47 N.C. App. 744, 269 S.E. 2d 159 (1980), *pet. for disc. rev. denied*, 301 N.C. 401, 274 S.E. 2d 266 (1980).

[7] In the case before us in which the Commission made an award of compensation, there was not sufficient determination by the finders of fact, and certainly no explicit findings, upon which this Court can determine the sufficiency of the evidence to support the Commission's findings and conclusion. It is explicitly stated in the Commission's finding number 5 that plaintiff's byssinosis "is partly responsible for her disability" and thus implicit that some other disease or infirmity is likewise "partly responsible for her disability." The evidence indicates that the other disease or infirmity is probably asthma and chronic bronchitis, although plaintiff also testified that two other doctors told her previously that she had emphysema. It also appears from the evidence that she is apparently also allergic to, among other things, dust, mold, mildew, trees, grass, animals, feathers, cotton dust, nylon dust and polyester dust. Because of the presence of these other infirmities and because this is a case of partial disability as opposed to one of total disability, it must be determined what percentage of claimant's disability is due to her oc-

cupational disease. *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458 (1981).

The medical evidence appearing in the record before this Court is not sufficiently definite on the cause of plaintiff's disability to permit effective appellate review. The only medical witness before the Commission, Dr. Harris, did not address the crucial medical question of interrelationship, if any, between plaintiff's occupational disease and her disability.

We deem it unnecessary to recite or recapitulate the evidence which is fairly summarized in the opinion and dissent in the Court of Appeals. However, solely for the purpose of illustrating the problems in assessing the medical evidence before us on causation, we will set forth only a part of plaintiff's evidence as it relates to the element of causation. Dr. T. Reginald Harris testified in part:

> She has an illness. In general terms, I thought it fitted the pattern of chronic obstructive lung disease . . . . She has three distinct syndromes that probably contributes (sic) to that impairment. These are asthma, byssinosis and chronic bronchitis.
>
> .   .   .   .
>
> If she did not work in cotton, I would not have any diagnosis of byssinosis.
>
> .   .   .   .
>
> There is a possibility that she has byssinosis and she certainly could have. . . . The answer is yes, could or might.
>
> Q. . . . Do you have an opinion satisfactory to yourself to a reasonable degree of medical certainty that the condition suffered by Pauline Hansel could or might be byssinosis? . . .
>
> A. My answer is yes, it could or might be byssinosis.
>
> .   .   .   .
>
> A. To amplify, I have difficulty in this patient for several reasons, to answer so specific a question. One of the difficulties, I'm not really aware of how much cotton dust ex-

posure this lady was involved. Your hypothetical question assumed considerable amounts of cotton dust exposure. That's why the history obtained by me is not specific enough for me to be able to evaluate over her employment, and the other problem she worked in the weaving department where there is much less dust than some of the other departments. If there was a lot of other fibers in the cotton in that department, there would be less exposure. That is one factor that would tend to add weight or less weight to consider the diagnosis. And the major difficulty is the diagnosis of asthma. I believe this lady has asthma and every person with asthma will react to cotton dust. If they have severe asthma they are not able to stay there. The milder cases, they can work in less dusty areas of the plant. So the diagnosis is more complex because this lady could have many of these same symptoms whether she worked around cotton dust because of the present asthma. She also has a history of chronic bronchitis symptoms of coughing day and night. Probably one of the major facts in her case is cigarette smoking as recorded by me. Could or might is true. I think that the possibility exists that both of the conditions are certainly present. It would be less complicated if she didn't have other problems, but she does have.

. . . .

Yes sir, I did say I had some difficulty in arriving at a diagnosis in this case due to the other conditions that I found that existed in this lady. I suspect the biggest difficulty was the history of asthma because the presence of asthma would lead you to anticipate as individuals would react with symptoms when they go to a textile plant. Because asthmatics react to all manners of dust. I said the symptoms of coughing, tightness of the chest could result or could be caused by the asthmatic condition rather than the breathing of dust. Yes, in the history that she gave me, she stated that she had a cough, or a dry hacking cough, as much as 30 years ago.

. . . .

That fact that she had chronic bronchitis since 1948 or 1950 indicated to me that she had chronic lung disease and probably chronic bronchitis, that is a proper term for that, as

long as that period of time. Let me tell you what my opinion was at the time of my examination and history and I think still is. This lady has chronic bronchitis and this lady likely and probably has asthma. There is a possibility that she could have a reaction known as byssinosis syndrome, but I am not able to determine the extent of that condition nor add much weight to its presence, because I do not have the ability to separate out any specific symptoms related to byssinosis that this lady has that cannot be explained by the other two conditions that are present. It is more difficult, also, because I do not know what her work exposure, history to cotton dust, is here.

. . . .

It's true, that the asthmatic condition and the other, chronic bronchitis, could be the cause of this lady's condition that I found upon examination, as well as the other findings, the syndrome findings that I made.

. . . .

People who have byssinosis for many years, have a lung disease that is indistinguishable from chronic bronchitis.

The following is excerpted from Dr. Harris's medical report of his examination of Mrs. Hansel on 10 August 1978 which was admitted into evidence as Exhibit "A":

Comment:

This patient has a lengthy history of obstructive pulmonary disease. She is a cigarette smoker and has had considerable textile work exposure. I do not have information which describes her dust exposure over the years. She has had considerable exposure to textile environment but this has been in the weaving department where traditionally, there has been less dust than in the earlier stages of processing cotton in a textile plant. This patient has a history suggesting chronic bronchitis with cough and sputum production. She also has a history of increased symptoms upon work exposure and has a typical history of increased symptoms on the first day of the work week after a work absence. The history she gives is similar to that of patients with byssinosis

and patients with chronic bronchitis. The picture is somewhat complicated by a history suggesting asthma and allegery in the past and by the history of vocal cord abnormalities.

. . . .

On the basis of the information available to me, this patient may well have three identifiable problems causing lung disease. She has a history compatible with and suggesting asthma. She is believed to have chronic bronchitis and to have byssinosis. The later diagnosis is made on the basis of chronic obstructive lung disease in a patient with a typical work history of byssinosis and presumably has had exposure to cotton textile dust over long enough time to permit development of this syndrome. It is true, however, that patients with asthma also react to cotton dust and have in-creased symptoms upon exposure — similar to those with the syndrome of byssinosis. Cigarette smoking is certainly a ma-jor contributing factor to chronic bronchitis. It is not possible to quantitate the relative contribution of the various etiological factors in her present respiratory impairment. It is likely that all are involved to some extent. It is this ex-aminers belief that the patient probably has asthma and that she does have chronic bronchitis as well as byssinosis.

. . . .

Diagnostic Conclusion:

1) Chronic Obstruction air ways disease.
   Asthma, probable.
   Byssinosis syndrome.
   Chronic bronchitis.

[8] In order for the Court to determine whether the Commission's findings and conclusions are supported by compe-tent evidence, the record before us must be supplemented by medical testimony to indicate answers to the following questions:

(1) Is plaintiff totally or partially incapacitated to work and earn wages? If partial, to what extent is she disabled; i.e., what is the percentage of her disability?

(2) What disease or diseases caused this disability?

(3) Which of the plaintiff's disabling diseases are occupational in origin, *i.e.*, which diseases are due to causes and conditions which are characteristic of and peculiar to plaintiff's occupation as distinguished from ordinary diseases of life to which the general public is equally exposed outside of the employment?

(4) Does plaintiff suffer from a disabling disease or infirmity which is not *occupational* in origin, *i.e.*, which is not due to causes and conditions characteristic of and peculiar to plaintiff's occupation as distinguished from ordinary diseases of life to which the general public is equally exposed outside of the employment?

If so, specify the non-occupational disease(s) or infirmities?

(5) Was plaintiff's non-occupational disease(s) or infirmity aggravated or accelerated by her occupational disease(s)?

(6) What percentage of plaintiff's incapacity to work and earn wages results from (a) her occupational disease(s) or (b) her non-occupational disease(s) which were aggravated or accelerated by her occupational disease(s)?

(7) What percentage of plaintiff's incapacity to work and earn wages results from diseases or infirmities which are non-occupational in origin?

We conclude that the Court of Appeals acted prematurely in vacating the award of the full Commission. In our discretion, we remand for further findings of fact.

The Industrial Commission must make specific findings of fact as to each material fact upon which the rights of the parties in a case involving a claim for compensation depend. *Wood v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979); *Thomason v. Cab Co.*, 235 N.C. 602, 70 S.E. 2d 706 (1952). If the findings of fact of the Commission are insufficient to enable the court to determine the rights of the parties upon the matters in controversy, the cause must be remanded to the Commission for proper findings of fact. *Young v. Whitehall Co.*, 229 N.C. 360, 49 S.E. 2d 797 (1948); *Moore v. Stevens & Co.*, 47 N.C. App. 744, 749, 269 S.E. 2d 159, 162 (1980); *Gaines v. Swain & Son, Inc.*, 33 N.C. App. 575, 235 S.E. 2d 856 (1977). *See* also 1 Strong's N.C. Index 3d, Appeal and Error § 57.3.

Since we cannot evaluate the testimony quoted above and correctly determine whether the findings made by the Commission are supported by the evidence, this case must be remanded to the Commission to re-examine the medical witnesses to elicit definite answers to the questions noted above. Upon the hearing on remand, the parties are not prohibited from offering additional evidence. After re-examination of the medical witnesses, the Commission will make findings of fact, enter its conclusions of law and issue its opinion and award based thereon.

For the reasons stated, the decision of the Court of Appeals is reversed and the case is remanded to the Court of Appeals with directions that it be remanded to the North Carolina Industrial Commission for further proceedings consistent with this opinion.

Reversed and remanded.

Justice EXUM concurring in result.

I concur in the majority's decision to remand this case to the Industrial Commission for further proceedings. Since I disagree with much of the majority's reasoning, I deem it necessary to set out my own views of the case.

First, I disagree with the majority's apparent notions that Hansel's occupational disease is simply byssinosis and that she is limited on remand to showing only that her exposure to cotton dust medically aggravated her bronchitis or asthma in order to recover for whatever incapacity for work was caused by the combined effect of all of her pulmonary problems.

As I understand the medical testimony, Hansel actually suffers from chronic obstructive pulmonary, or lung, disease to which several etiological factors could have contributed, i.e., cigarette smoking, bronchitis, asthma, and cotton dust exposure. Dr. Harris testified that Mrs. Hansel "has an illness. In general terms, I thought it fitted the pattern of chronic obstructive lung disease . . . . She has three distinct syndromes that probably contributes [sic] to that impairment. These are asthma, byssinosis, and chronic bronchitis." Later Dr. Harris also identified cigarette smoking as a possible contributing factor.

In addition to this case, we have considered three other so-called "byssinosis" cases. *Morrison v. Burlington Industries*, 304 N.C. 1, 282 S.E. 2d 458 (1981); *Walston v. Burlington Industries*, (No. 116, Fall Term 1981); and *Wood v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979). The medical etiology of the disease was the primary focus of all the cases except *Wood*.

Although Morrison claimed benefits for "an occupational disease, to wit: byssinosis . . . caused by exposure to cotton dust," the medical testimony, the Commission's findings, and this Court identified her occupational disease as chronic obstructive lung disease. Morrison also suffered from bronchitis, was a cigarette smoker, and could have had emphysema. The Commission found ultimately, however, that her chronic obstructive lung disease was caused at least in part by her cotton dust exposure, a finding which this Court concluded was supported by the evidence.

Walston also claimed benefits for "byssinosis . . . caused by exposure to cotton dust." The medical testimony again, however, referred to the cause of Walston's incapacity for work as "pulmonary disease" and "pulmonary problems." The medical testimony identified the components of his pulmonary disease as "chronic bronchitis, pulmonary emphysema, [and] possible byssinosis." Dr. Mabe testified, "It is correct as a matter of terminology, to regard the term 'chronic obstructive lung disease' as broader in its complications than, say, fibrosis, which can be a localized situation, or emphysema, which can only be general. Chronic obstructive lung disease is the broadest of these terms. It will take them all in. That encompasses all of them in the chronic bronchitis or segmental pulmonary fibrosis."

It is clear from the medical testimony in *Morrison, Walston* and this case, and from medical literature on the subject[1] that the term "byssinosis" refers simply to the effect, if any, of a worker's

---

1. *See generally* Bouhuys, Schoenberg, Beck and Schilling, *Epidemiology of Chronic Lung Disease in a Cotton Mill Community*, 5 Traumatic Medicine and Surgery for the Attorney 607, reprinted from *Lung*—An International Journal on Lungs, Airways, and Breathing, 154(3): 167-186 (1977). The article concludes with the following paragraph:

"There is continuing discussion about the definition of the term 'byssinosis,' and confusion about the presumed co-existence of chronic bronchitis and of

exposure to cotton dust on the worker's overall pulmonary function. The disease, however, which ultimately causes a worker to be incapacitated for work is consistently referred to by the medical witnesses in these cases as chronic obstructive lung disease.[2] This disease in its ultimate disabling form may have several components such as bronchitis, asthma, emphysema, and byssinosis. It may, in turn, be caused by one or more environmental factors such as cotton dust exposure or cigarette smoking, or both. The crucial difference between byssinosis, or the effect of cotton dust exposure on the lungs, and other conditions caused by industrial exposures, such as silicosis and asbestosis, is this: The effects of cotton dust exposure (byssinosis) are indistinguishable from the effects of other kinds of lung problems such as bronchitis, or the effects of cigarette smoking; whereas the effects of silicosis and asbestosis are identifiable by biopsy or an autopsy.[3]

byssinosis among textile workers. To a large extent this debate is one of semantics. Cotton and other textile workers are at risk of acute as well as chronic respiratory symptoms and lung function loss. There can be little doubt that both are caused by exposure to respirable dust in textile mills. The progression from repeated acute insults to the chronic disease has not been traced with certainty, but there is no good evidence against—and much evidence for—such a train of events. It seems most logical to define byssinosis as a dust-induced disease with initial acute responses followed by a stage of chronic lung disease characterized by chronic airway obstruction. This definition is implicit in the description of the clinical stages of byssinosis given by Schilling. For purposes of compensation and prevention, acute responses to textile dust as well as chronic airway obstruction in textile workers should be considered as two stages of one disease syndrome, byssinosis."

2. This is also the term used throughout the Bouhuys article to describe the disabling condition in its ultimate form. *Id.*

3. In *Walston*, for example, Dr. Williams testified, "There is not specifically any objective finding to say that a man does or doesn't have byssinosis . . . such as a biopsy or autopsy, such as with silicosis and asbestosis, although in the early stages one can demonstrate a reactivity to the dust by doing pulmonary function studies before and after six hours exposure to the work environment. But in the latter stages, such as one might see with chronic obstructive pulmonary disease, this is no longer valid and these are not specific diagnostic criteria."

In *Morrison*, Dr. Sieker testified that there were "two identifiable etiological factors" which contributed to Morrison's chronic obstructive lung disease. "One is cotton dust exposure, the other is her cigarette consumption." He said, "[I]n a somewhat arbitrary way but with clinical judgment I assign the etiological factors about 50 percent—50 to 60 percent for the cotton dust exposure and 40-50 percent for the cigarette smoking and any attendant problems with that. . . . At the present time there is no laboratory type of test that would do this. This [assignment of

Hansel's claim, therefore, like those of Morrison and Walston, is for the incapacitating effects, if any, of her chronic obstructive lung disease. In this case, therefore, as others in which the worker claims benefits for incapacity to work caused by chronic obstructive pulmonary disease, the central factual inquiry should be first, whether the effects on the pulmonary function caused by cotton dust exposure (byssinosis) significantly contributed to the ultimate medical problem, *i.e.*, chronic obstructive lung disease and second, whether and to what extent the chronic obstructive lung disease caused incapacity for work.

I further disagree with the majority's position that questions three and four can be answered by medical witnesses, for these questions are really conclusions of law to be made by the Commission after it determines certain preliminary factual questions. Whether a particular disease is an occupational disease is ultimately a question of law, for it requires the application of the legal standards set out in G.S. 97-53(13) to the facts. In an occupational disease claim, "[h]aving made appropriate findings of fact, the next question the Commission must answer is whether . . . the illness plaintiff has contracted falls within the definition set out in the statute. This latter judgment requires a conclusion of law." *Wood v. Stevens & Co., supra,* 297 N.C. at 640, 256 S.E. 2d at 695-96.

For a disease to be occupational and therefore compensable under G.S. 97-53(13) "two conditions must be met: (1) It must be 'proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment'; and (2) It cannot be an 'ordinary disease of life to which the general public is equally exposed outside of the employment.'" *Booker v. Medical Center,* 297 N.C. 458, 468, 256 S.E. 2d 189, 196 (1979). If there is a greater risk of contracting the disease by workers in a given occupation because of conditions "characteristic of and peculiar" to the occupation, the "nexus between the disease and the employment which" makes the disease occupational and therefore compensable is provided and the sec-

etiological factors] had to be based on . . . one's judgment of the effects of these agents on the respiratory system."

In the present case Dr. Harris testified that the effects of byssinosis were "indistinguishable from chronic bronchitis."

ond condition set out above is satisfied. *Id.* at 475, 256 S.E. 2d at 200.[4] The statute thus insures by its terms that a disease, in order to be compensable, must have the requisite causal connection to the occupation out of which it allegedly arose.

As the majority correctly notes, however, it is not necessary that the occupational "causes and conditions" be the sole cause of the disease. It is enough if these occupational "causes and conditions" are factors which significantly contribute to the development of the disease.[5] If occupational "causes and conditions" as defined by G.S. 97-53(13) significantly contribute to a disease's development, and if the disease itself is not one to which the general public is exposed equally with those engaged in the employment in question, the disease is an occupational disease even though non-occupational causes and conditions also contribute to it. Conversely, a disease is not an occupational disease if the occupational causes and conditions do not contribute to its development in a significant way.

Whether the contribution of occupational "causes and conditions" has been significant or insignificant must largely be determined by evidence relating to the extent and nature of the exposure to the occupational conditions and expert medical opinion relating to the significance of this exposure in light of other factors which may also have contributed to the disease's development. Significant means, "having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE." Webster's Third New International Dictionary 2116 (Merriam-Webster 1971). "Significant" as we are using it is to be

---

4. The disease need not be one which originates exclusively from or is unique to the particular occupation in question. *Booker v. Medical Center, supra.* Nor is the fact that the disease is an ordinary disease of life to which members of the general public also succumb fatal to an occupational disease claim if the "greater risk" nexus is present; for in such cases the public is not exposed to the disease equally with those engaged in the particular employment in question. *Id.* Thus ordinary diseases of life such as serum hepatitis, tuberculosis and contact dermatitis may be occupational diseases provided that the employee because of his employment has a greater risk of contracting them than does the public generally. *Id.*, and cases cited therein.

5. For a full discussion of the significant contribution concept and the authorities upon which it is based *see Morrison v. Burlington Industries,* 304 N.C. 1, 282 S.E. 2d 458 (1981) (Exum, J., dissenting).

contrasted with "negligible," "unimportant," "present but not worthy of note," "miniscule," "of little moment." The word has reference not so much to the quantity, in terms of percentage of contribution made by occupational exposure, but more to the quality of its contribution. The factual inquiry, in other words, should be whether the occupational exposure was such a significant factor in the disease's development that without it the disease would either (1) not have developed or (2) not have developed to such an extent that it results in the incapacity for work for which the worker claims benefits.

To say that occupational causes and conditions must be the *sole* cause of a disease before it can be considered occupational and therefore compensable is too harsh a principle from the standpoint of the purposes and policies of our Workers' Compensation Act. This Act "should be liberally construed so that the benefits under the Act will not be denied by narrow, technical or strict interpretation." *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972).

To say on the other hand that if occupational causes and conditions contribute to the slightest extent, however miniscule or insignificant, to the etiology of a disease, the causation requirement is satisfied places too heavy a burden on industry and tends to compromise the valid principle that our Workers' Compensation Act should not be transformed into a general accident and health insurance law.

Neither should a disease to which occupational conditions have significantly but not entirely contributed be considered as some kind of *pro tanto* occupational disease in which an award is made not for the incapacity for work actually caused by the disease but only for so much of such incapacity as corresponds mathematically to the extent of contribution of the occupational conditions. First, the cases in which the point has been considered do not support this view. They either support the significant contribution principle or some less rigorous principle from the worker's standpoint.[6] Second, G.S. 97-52 provides that "[d]isablement or death . . . resulting from *an occupational disease* de-

---

6. These cases are collected in my dissent in *Morrison v. Burlington Industries, supra.*

scribed in G.S. 97-53 shall be treated as the happening of an injury by accident within the meaning of the North Carolina Workers' Compensation Act . . . . " (Emphasis supplied.) General Statute 97-53(13) provides a generic definition of diseases which may be considered occupational. I believe our legislature intended that a disease either be an occupational disease or that it not be. If it is an occupational disease it is treated like an industrial accident. There is no suggestion in the statutes that a worker could have an occupational disease *pro tanto*, *i.e.*, only to the extent of the contribution of an occupational condition. Third, as I point out below, and as cases from other jurisdictions demonstrate,[7] some of these diseases which have dual or multiple causes such as chronic obstructive lung disease, present difficult medical questions regarding the extent to which various causative factors respectively contributed. We ask too much of the medical profession if we require it to assess in terms of mathematical percentages the relative contributions of the various possible causes of such diseases.[8] At most the physicians should be asked to determine only whether the occupational conditions, such as cotton

---

7. These cases are collected in my dissent in *Morrison v. Burlington Industries*, *supra*.

8. Dr. Harris, for example, testified, "I do not have the ability to separate out any specific symptoms related to byssinosis that this lady has that cannot be explained by the other two conditions that are present." In his medical report he stated, "It is not possible to quantitate the relative contribution of the various etiological factors in her present respiratory impairment. It is likely that all are involved to some extent." In *Walston v. Burlington Industries*, *supra*, Dr. Williams was unable to testify regarding the relative contributions to Walston's lung disease made, respectively, by his exposure to cotton dust and his cigarette smoking. He said, "I find it very difficult to answer the question as to . . . what percentage would the cotton dust exposure represent to the pulmonary condition. On the one hand, we have had the opportunity to treat hundreds of patients with this same type of syndrome and findings, in which case it is almost certain the primary etiological agent was cigarette smoking, and this fellow was a smoker. On the other hand, there are figures beginning to emerge to show that it is possible for workers exposed to cotton dust to develop chronic obstructive lung disease even in some instances in non-smokers even though the incident is definitely greater in smokers which accounts for the reason I said it might be a contributory factor, but this is about as close as I can come. I cannot give a percentage. I don't have an opinion on a specific percentage."

Although in *Morrison*, Dr. Sieker did testify to the relative contribution of cigarette smoking and cotton dust exposure in terms of percentages, he conceded that this assessment was made "in a somewhat arbitrary way but with clinical judgment . . . there is no laboratory . . . test that would do this . . . ."

dust exposure, were or were not in the particular case a significantly contributing factor in the disease's etiology.

Thus in addressing this industrial disease claim I would require the Commission to consider and resolve several crucial factual issues. The first is whether the employee has a disease and, if so, what is it. "The Commission must determine first the nature of the disease from which the plaintiff is suffering—that is, its characteristics, symptoms and manifestations." *Wood v. Stevens & Co., supra*, 297 N.C. at 640, 256 S.E. 2d at 695. Second, the Commission must determine whether any causes and conditions 'characteristic of and peculiar to' the occupation in question significantly contributed to, or were significant causative factors in, the disease's development. Finally, the Commission must determine whether the disease is an ordinary disease of life to which the general public is exposed in the same degree as the worker in question or, in other words, whether the worker is, because of his occupation, exposed to a greater risk of contracting the disease than members of the public generally.

If all of these crucial factual issues are answered favorably to the worker, then the Commission must conclude as a matter of law that the worker has an occupational disease. If any one of them, however, is answered unfavorably to the worker, then the Commission must conclude as a matter of law that there is no occupational disease.

I recognize that we are dealing with a relatively new occupational disease statute which reasonably has been the source of some confusion regarding occupational disease law in this state. This confusion is compounded by the medical complexities involved in chronic lung disease cases. "The causes and development of byssinosis, and the structural and functional changes produced by the disease, are still the subject of scientific debate." *Wood v. Stevens & Co., supra*, 297 N.C. at 641, 256 S.E. 2d at 696. A recent carefully controlled study cited in *Wood* concluded, however, that although the "pathology of the chronic lung disease of textile workers remains unclear," textile workers, "not only . . . carders and spinners . . . but also . . . yarn preparers and weavers . . ." suffer from "an excess of chronic lung disease" and it "is almost

certain" that this excess "is caused by dust exposure of the workers in the mills."[9]

In view, therefore, of the legal and medical complexities involved, we should remand this matter to the Commission for the taking of further evidence and a new determination of whether Hansel has an occupational disease. I believe there is enough evidence already adduced to indicate that Hansel may be able to prove that her cotton dust exposure significantly contributed to her ultimate chronic obstructive lung disease and that it was this lung disease which ultimately caused her to be incapacitated for work, either partially or totally. I, however, would direct the Commission to proceed in accordance with the principles to which I have referred in this concurring opinion rather than those announced by the majority.

Justice CARLTON joins in this concurring opinion.

9. Bouhuys, Schoenberg, Beck and Schilling, op. cit., *supra* n. 1. *See also* 1B Larson, *supra*, § 41.64(b), n. 83.1.